**SO ORDERED.**

**SIGNED this 07 day of September, 2010.**



_____
**JANICE MILLER KARLIN**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **HAROLD LLOYD MYERS and** | ) | **Case No. 09-41148** |
| **DEBBIE KAY MYERS,** | ) | **Chapter 13** |
| | ) | |
| Debtors. | ) | |
| | ) | |
| **FIRST NATIONAL BANK OF OMAHA,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adv. No. 09-7067** |
| | ) | |
| **DEBBIE KAY MYERS,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on the Complaint Seeking Exception to Discharge Pursuant

to 11 U.S.C. § 523(a)(2)(A)[1] filed by Plaintiff, First National Bank of Omaha ("Bank"). Bank

_____

[1]Doc. 1.

contends a portion of the debt Defendant, Debbie Kay Myers ("Debtor"), owes on her revolving credit account with the Bank was procured by fraud and should be excepted from her discharge. After conducting a trial, during which the Court had the opportunity to judge the relative credibility of the witnesses, the Court is prepared to rule. This is a core proceeding over which this Court has jurisdiction to enter a final order.[2]

## I.  FINDINGS OF FACT

The Bank contends that at the time Debtor incurred several thousands of dollars of debt by making purchases on the Bank's credit card, Debtor knew, or should have known, that she lacked the intent and/or the ability to repay those debts. Debtor claims she intended to repay the debt in full, over time, as she had done over the years (or at least since her last bankruptcy), and that at the time the charges were made she had the ability to repay the debt according to the terms of the credit card agreement.

Debtor filed a petition under Chapter 13 of the Bankruptcy Code on July 14, 2009 with her spouse ("Debtors"). Along with the filing of the petition, Debtors filed their bankruptcy schedules and Statements of Financial Affairs ("SOFA"). According to Debtors' Schedule I—Current Income of Individual Debtors, coupled with the testimony received at trial, their monthly net income on the date of filing was $5,204. Mrs. Myers is and has been unemployed at all relevant times, and has no independent source of income. Mr. Myers receives income from social security, a pension or retirement account, from rental houses,[3] and wages he earns as a part time truck driver. His income

---

[2]28 U.S.C. § 157(b)(1)(jurisdiction to hear core proceedings) and § 157(b)(2)(I) (action to determine dischargeability of debt is core proceeding), 28 U.S.C. § 1334 and 11 U.S.C. § 523(c).

[3]Although Debtors own rental housing worth $77,100, according to their Schedule A—Real Property, their SOFA shows they lost $8,083.00 on "rental real estate, royalties, etc." in 2007, and $7,345.00 in 2008. Accordingly, the loss on this rental housing was not a sudden event that precipitated the bankruptcy.

2

typically increases in the summer, so this petition was filed in the middle of the best income months for this family. In addition, there was no testimony that this bankruptcy was precipitated by a recent loss or reduction of income or illness, or the prediction of a future such loss of income.

Debtors' Schedule J indicates their average monthly expenses, *excluding* any payments to unsecured creditors, were $4,833.58, leaving them with a net monthly income of $371.23 to pay all their unsecured debt.[4] On Schedule F, Debtors listed the following creditors with unsecured, nonpriority claims on the date they filed their bankruptcy petition:[5]

| Creditor | Amount of Claim | Credit Limit | Min. Monthly Payment |
|---|---|---|---|
| AARP Credit Card Services | $286.00 | | |
| Avenue | $420.30 | $900 | $20.00 |
| Bank of America | $20,983.69 | $21,400 | $532.00 |
| Capital One | $7,278.55 | $7,200 | $103.00 |
| Chase | $19,744.77 | $14,000 | $470.00 |
| Commerce Bank | $11,563.53 | $11,500 | $347.00 |
| Dillards | $1,720.66 | $2,000 | $32.00 |
| First National Bank of Omaha | $12,021.35 | $11,700 | $298.00 |
| JC Penny | $3,277.04 | $3,700 | $163.00 |

[4]In addition, their Plan called for payments of $210/month to Nebraska Furniture Mart for recently purchased furniture out of this $371.23, so in actuality, this left only $161/month for repayment of unsecured debt.

[5]The Credit Limit and Minimum Monthly Payment information was taken from Defendant's Trial Exhibit A, which was a credit report created on June 2, 2009. Because the bankruptcy was not filed until July 14, 2009, there may be slight differences in the minimum monthly payments on the credit report compared with those that existed on the date Debtors filed their petition. Any differences, however, are insufficient to impact the Court's analysis. In some instances, such as Bank of America, the amounts listed in the schedules reflected a combination of multiple accounts. AARP Credit Card Services and Kroger Personal Finance did not appear in Exhibit A, as it appears those accounts may have been in Mr. Myers' name, only, and this Adversary Proceeding has been brought only against Ms. Myers. The information regarding credit limit and the minimum monthly payment for "RBS" was taken from Bank's Exhibit 16, which was a statement on the RBS account for the billing period 4/18/09 - 5/18/09.

3

| Creditor | Amount of Claim | Credit Limit | Min. Monthly Payment |
|---|---|---|---|
| Kroger Personal Finance | $4,375.93 | | |
| Macys | $4,908.80 | $5,200 | $205.00 |
| Pay Pal | $1,399.04 | $1,500 | $39.00 |
| RBS | $10,050.76 | $10,100 | $241.00 |
| US Bank | $6.998.00 | $7,000 | $68.00 |

In addition to the above general unsecured creditors, Debtors also had a revolving credit account with Nebraska Furniture Mart for purchases in which Nebraska Furniture Mart took a security interest. The minimum monthly payment on that account was $280 as of June 9, 2009.[6] Based upon this evidence, Debtors were required to spend approximately $2,800 each month on their various revolving credit accounts just to make the minimum monthly payments and keep all accounts in good standing. Accordingly, during the time Debtor was making the large charges with the Plaintiff in this case, her monthly budget **deficit** was already in the $2,400 range.

On March 13, 2009, Debtor's account with the Bank was in good standing (because she was making the minimum required monthly payment); it had a balance of $2,733.81. Between March 14, 2009 and April 21, 2009, a period of 39 days, Debtor made purchases on this account totaling $9,855.85, which brought the card slightly over its credit limit. There were at least 15 to16 different occurrences during this period where she made multiple charges on a single date. The charges made during this period included, but were not limited to, charges to The Home Depot totaling $2,174.46,

---

[6]Bank's Exhibit 16.

4

The Floor Trader totaling $2,041.42, and Lowe's totaling $793.54. Thus, approximately $5,008 was used for repairs directly related to a roof leak at Debtor's home.[7]

In addition to those charges, which she made to buy materials to repair the damage caused by the roof leak, Debtor made numerous other charges including, for example, five payments to QVC,[8] over $500 to Bed Bath and Beyond, to multiple restaurants, several charges to gas stations, and numerous charges at stores such as Walmart, Target, Kohl's and Gordmans. Accordingly, the evidence clearly showed that Debtors were not only using this card to help fund the repairs to their home, but were using the card to pay nearly all of their ongoing monthly living expenses for food and gasoline, and to make over $1,200 in purchases at general merchandise stores over a very short period of time.

At trial, Debtor testified that many of the purchases made on the Bank's credit card account were to make repairs caused by the water leak. Debtor indicated that she intended to repay those charges made on the Bank's credit card account with the insurance proceeds from a claim they filed with their homeowners' insurance company, as well as from Mr. Myers' income. Debtors received a partial check from their insurance company in the amount of $5,490.61 and deposited it in their checking account on March 24, 2009.[9] This was ten days into the 39-day spending spree. Debtors

---

[7]There was also a large purchase from Best Buy in the amount of $1,235.65, but neither party identified what was purchased.

[8]These payments appear to have been set up on a payment plan. The charges indicate that they are payments "2 of 6", "3 of 6", "4 of 6", "5 of 6" and "6 of 6". There was no explanation given why the final five payments on this payment plan were all made on April 1 and April 2.

[9]Bank's Exhibit 15 at 9.

5

then received a second check from their insurance company in the amount of $6,837.70; that check was deposited into their checking account on April 27, 2009.[10]

Accordingly, by April 27, 2009, Debtors had received $13,519 in insurance proceeds, and had charged $5,008 on Bank's credit card for roof leak repairs. Notwithstanding this fact, Debtor elected to only make three payments on the Bank's credit card account after this time, in the amounts of $58, $185, and $800. Accordingly, although Debtor testified that she intended to use the proceeds from the insurance claim to repay the debts charged on the Bank's credit card account, and the proceeds she actually received were over two times greater than the amounts charged on the account for repairs related to the roof leak, less than 10% of the insurance money actually went to the Bank. Further, only 10% of the charges made on the account during that 39-day period were actually paid by Debtor before she filed this bankruptcy.

Debtor also testified concerning her family's financial status at the time she incurred these charges; she claimed she believed they had the ability to repay their debts and were living within their means. She based this on the fact that they had been able to pay all of their monthly expenses, including (only) the minimum monthly payments on all credit cards. She testified that they were doing fine until their minimum monthly payments were raised on several accounts in May of 2009, and it was this increase in the minimum monthly payment—that she contended she first learned about after the charges on the Bank's credit card—that precipitated the bankruptcy.

The documentary evidence received, however, contradicted this testimony. Specifically, Bank's Exhibit 16 showed that Debtor was delinquent on numerous accounts at or about the same time, and/or she had incurred late payment fees for untimely payments and over limit charges for

---

[10]*Id.* at 6.

charging over the maximum allowed by various card issuers. Exhibit 16 also included several "past due" letters from different creditors.

Finally, other than this alleged increase in minimum payments, nothing "forced" Debtor into bankruptcy. No lawsuits had been filed against her or her husband, no seizures of assets had occurred, her husband's wages had not been garnished or otherwise diminished, and they had suffered no repossessions of assets. Thus, the timing of the bankruptcy was totally voluntary.

Additional facts will be discussed below, when necessary.

## II.      CONCLUSIONS OF LAW

The Bank seeks to exclude from discharge, pursuant to 11 U.S.C. § 523(a)(2)(A),[11] $9,855.85 in purchases made between March 14, 2009 and April 21, 2009. It is important to note that the purpose of bankruptcy is to allow a debtor to have a financial "fresh start." However, the Bankruptcy Code does not provide a blanket fresh start for all debtors under all circumstances. In fact, § 523 provides an express list of debts that are nondischargeable. Section 523 balances the competing policies of allowing a fresh start while preventing a debtor from prospering from her own bad acts.[12]

The burden of proof rests with the party opposing the discharge. Accordingly, the Bank has the burden of proof, and must meet that burden by a preponderance of the evidence.[13] Discharge

---

[11] This case was filed after October 17, 2005, when most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 became effective. All future statutory references are thus to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 11 U.S.C. §§ 101 - 1532 (2005), unless otherwise specifically noted.

[12] *Field v. Mans*, 157 F.3d 35, 44 (1st Cir. 1998).

[13] *See Grogan v. Garner,* 498 U.S. 279, 291 (1991) (holding that preponderance of the evidence standard, not clear and convincing standard, applies to all exceptions to discharge). *See also In re Busch*, 369 B.R. 614, 623 (10th Cir. BAP 2007).

7

provisions are strictly construed against the creditor and, because of the fresh start objectives of bankruptcy, doubt is to be resolved in the favor of debtors.[14]

Subsection 523(a)(2)(A) provides an exception to discharge "for money, property, services, or an extension, renewal, or refinancing of credit" if such debt was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." The Bank must thus prove, by a preponderance of the evidence, (1) that Debtor made a false representation; (2) that the representation was made with intent to deceive the Bank; (3) that the Bank justifiably relied on this representation; and (4) that the Bank sustained a loss as a result of the false representation.[15] A debtor's intent to deceive a creditor in making false representations, within the meaning of the fraud discharge exception, may be inferred from the totality of circumstances, or from a knowingly made false statement.[16]

Intent to deceive may also be demonstrated by a defendant's reckless disregard for the truth or accuracy of her representations.[17] "The Court is mindful, however, that reckless disregard for the truth or accuracy of the representations as a basis for satisfying the intent requirement under 11 U.S.C. § 523(a)(2)(A) should be construed narrowly."[18] There must be some indication as a whole

---

[14]*In re Sweeney*, 341 B.R. 35, 40 (10th Cir. BAP 2006) (citing *In re Kaspar*, 125 F.3d 1358, 1361 (10th Cir. 1997)).

[15]*Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).

[16]*Id*. at 1375.

[17]*In re Daviscourt,* 353 B.R. 674, 685 (10th Cir. BAP 2006) ("Intent to deceive under this subsection [§ 523(a)(2)(A)] may be inferred from the totality of the circumstances, and includes reckless disregard of the truth."); *In re McGuire*, 284 B.R. 481, 493 (Bankr. D. Colo. 2002) (noting that "the Tenth Circuit has held that a finding of reckless disregard may satisfy the scienter element" under § 523(a)(2)).

[18]*FTC v. Abeyta (In re Abeyta)*, 387 B.R. 846 (Bankr. D.N.M. 2008) (citing *In re McGuire*, 284 B.R. 481, 854, 493 (Bankr. D. Colo. 2002)).

8

that "'presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor.'"[19] A debtor's silence regarding a material fact can constitute a false representation under § 523(a)(2)(A).[20]

In this case, the Debtor cannot seriously contest that the Bank relied on her representation that each time she used her credit card she had the intent and ability to repay the debt or that the Bank suffered loss as a result of that reliance.[21] Debtor ultimately admitted that each time she made such a purchase with her card, she was making the representation to the Bank that she had the intent and the ability to repay the debt. Debtor also did not present any evidence to rebut the testimony by the Bank's representative that the Bank relied on the agreement it had with Debtor, and that it would not have authorized the purchases made on the credit card, if it had known Debtor did not have the intent or ability to repay the debt. Similarly, the uncontroverted evidence received at trial established that the Bank has sustained a loss as a result of the representations made by the Debtor. The only real issues before the Court are whether Debtor knew, or should have known, at the time she made the purchases using her credit card that she lacked the ability or the intent to repay the debt, and whether she acted either with the intent to deceive the creditor, or acted with reckless indifference as to whether the representations she made were truthful.

---

[19] *Groetken v. Davis (In re Davis)*, 246 B.R. 646, 652 (10th Cir. BAP 2000) *aff'd in part and vacated in part by* 35 Fed. Appx. 826 (10th Cir. 2002) (quoting 3 William L. Norton, Jr. Norton Bankruptcy Law and Practice 2d § 47:16, n.62 (1999) (citations omitted)).

[20] 4 Collier on Bankruptcy ¶ 523.08[1][d] (15th ed. rev. 2008).

[21] Bank's Exhibit 19, which the Bank representative testified all cardholders must agree to as a condition precedent to activating their account, expressly states that the account holder represents, each time the account is used, that holder intends to and has the ability to repay all amounts due. The Court is not persuaded by Debtor's argument that because she elected not to closely read the information that came with the card, she should not be bound by its terms.

9

Because direct evidence of fraudulent intent is rare, as such evidence would have to come directly from debtors themselves, courts typically look for specific indicia of fraud, often referred to as "badges of fraud," when analyzing a case under § 523(a)(2)(A).[22]  However, when analyzing a case in light of these badges of fraud, the Court must be mindful that these cases are peculiarly fact specific, and the conduct in each case must be viewed individually.[23]  In relation to credit card charges, numerous courts have applied the following nonexclusive list of factors to determine a debtor's intent, for purposes of § 523(a)(2)(A), under the totality of the circumstances test:

(1) the length of time between the charges made and the filing of bankruptcy;

(2) whether the debtor consulted an attorney regarding bankruptcy prior to the charges being made;

(3) the number of charges made;

(4) the amount of the charges;

(5) the financial condition of the debtor at the time the charges were made;

(6) whether the charges were above the credit limit of the account;

(7) whether the debtor made multiple charges on any given day;

(8) whether or not the debtor was employed;

(9) the debtor's employment prospects;

(10) the debtor's financial sophistication;

---

[22]Actions from which fraudulent intent has been inferred include situations in which a debtor conceals pre-bankruptcy conversions, converts assets immediately before the filing of the bankruptcy petition, gratuitously transfers property, continues to use transferred property, and transfers property to family members. Courts also consider the monetary value of the assets converted, whether the debtor obtained credit in order to purchase exempt property, whether the conversion occurred after entry of a large judgment against the debtor, whether the debtor had engaged in a pattern of sharp dealing prior to bankruptcy, and whether the conversion rendered the debtor insolvent. *Cadle Company v. Stewart (In re Stewart)*, 263 B.R. 608, 611 (10th Cir. BAP 2001).

[23]*Id.*

10

(11)    whether there was a sudden change in the debtor's buying habits; and

(12)    whether the purchases were made for luxuries or necessities.[24]

In this case, numerous factors weigh in the Bank's favor. For example, the length of time between the charges and the filing of the bankruptcy was quite short. The charges in question were all made between March 14, 2009 and April 23, 2009.

Second, Debtor indicated that she contacted her bankruptcy attorney on approximately June 1, 2009, less than two months after incurring all of the charges, and met with him for the first time on June 16, 2009.[25] Although Debtor claims she did not consult an attorney prior to incurring these debts, she had filed a previous bankruptcy, had obtained a discharge of her dischargeable unsecured debts in that prior case, and thus knew how the system worked.

Third, the number of charges made by Debtor in this short period of time were significant, as were the amounts of those charges. Debtor made over 60 charges totaling more than $9,000 in a period of less than 40 days. More importantly, Debtor's financial condition was extremely dire at the time she made the charges. Debtor had at least 14 open credit card accounts as of June 2, 2009. Almost every account was within a few hundred dollars of its credit limit, or was charged at a level above the credit level. In addition, many were in a delinquent status, or had been subject to "over limit" fees or late charges for late payment. Debtor's own Schedule F— Creditors Holding Unsecured Nonpriority Claims, listed unsecured debt of $105,028 at the time of filing.

---

[24]*In re Kukuk,* 225 B.R. 778, 786 (10th Cir. BAP 1998).

[25]The evidence also shows that Debtor obtained a copy of her credit report on June 2, 2009. Debtor testified this was likely done at the request of someone, likely a credit counselor or her attorney, but she could not remember who made the request. *See* Debtor's Exhibit A.

11

Debtor suggested that because she was able to make all of the required minimum credit card payments at the time she made these charges, that that is evidence that she had the ability to, and intended to, continue to pay for these charges. Her argument is not well placed for at least three reasons. First, she was not current on all of her credit cards at the time she made these purchases. Exhibits received at trial showed she was receiving delinquency letters during this time period, and that she had incurred some late charges and over-limit fees related to her failure to keep up with this burgeoning debt. Second, even if she could have continued to make minimum payments on all of these at, or nearly at-limit accounts, those minimum payments, by definition, were increasing because she continued to make large credit card purchases for everyday living expenses. Third, she simply did not have sufficient income to continue making the ever-increasing minimum payment amounts. The Bank clearly demonstrated that there was no way Debtor would have been able to continue making the minimum monthly payments on her credit cards once she reached a point where all of her available credit had been exhausted and she was forced to pay her normal monthly living expenses with the family earnings, rather than on credit.

The United States Bankruptcy Appellate Panel of the Tenth Circuit, in *In re Kukuk*,[26] stated:

> . . . in considering the debtor's ability to pay a credit card debt under the totality of the circumstances test, the inquiry should be limited to whether the debtor had the ability to pay the debt within the terms of his or her credit card agreement. For example, many credit card agreements only require a debtor to make minimum monthly payments. Thus, in considering ability to pay, the court should determine whether the debtor had the ability to make the minimum monthly payment at the time the debt was incurred.[27]

Applying this standard, it is clear that the Debtor did not have the ability to make the minimum monthly payments on this card at the time the charges were incurred. Debtor's sworn bankruptcy

[26]225 B.R. 778 (10th Cir. BAP 1998)

[27]*Id*. at 787 (emphasis added).

12

schedules indicate that her family had at most $371.23 in available monthly income that could be used to pay unsecured debt at the time the petition was filed, and probably as little as $160 after paying Nebraska Furniture Mart on its secured claim. There was no evidence presented at trial that Debtor had or expected any significant changes in either income or expenses between March and April of 2009 (when the charges were incurred) and July of 2009 (when the bankruptcy petition was ultimately filed). So Debtor, who presented as knowledgeable about her finances, and who was clearly experienced in how bankruptcy works, had to have known when she made these charges that she did not have the income to make the minimum monthly payments that would become due on these additional charges. The Court also believes she fully understood that most unsecured debts can be discharged in a bankruptcy proceeding.

Debtor's testimony regarding her ability to repay this debt was not credible. She at first denied that she was having difficulty making all the minimum payments even before she went on this spending spree in March 2009. But she had to then admit that this testimony conflicted with her earlier deposition testimony. And a quick look at Schedules I and J, which she represented to the Court as accurate upon filing, also belie her testimony. They show she had $371/month income to pay minimum payments that had risen to over seven times that amount. This was not even close. If Debtor really did not realize when she made in excess of $9,800 in purchases that she did not have the financial ability to repay the debt (which the Court does not believe given Debtor's demeanor while testifying), her failure to know it constitutes reckless disregard for the truth.[28]

---

[28]Debtor testified that she had "no idea" what the total minimum payment was on all her credit cards in March 2009. Failure to know this when she elected to charge in excess of $9,800 in 39 days, within 90 days of filing bankruptcy, is, at best, reckless.

13

Further, Debtor contends that the reason for this non-customary spending pattern was the need to repair damages from a roof leak until she could be reimbursed by her insurance company. But a close look at the charges during this period demonstrates that many of the charges—at least 40%, do not appear to be associated with those repairs.[29]  More importantly, what Debtor did, or failed to do, with those insurance proceeds once received, is most indicative of her true intent. Debtor elected to use only approximately 10% of the $13,519 in insurance proceeds to repay Bank for the repair costs she charged.  Accordingly, the Court simply does not believe Debtor's self-serving testimony that she intended to repay the debts incurred with insurance proceeds, and thus she did in fact have the intent to repay each charge when it was incurred.  Although the Court agrees that the $800 payment she made to the Bank on these charges is some evidence that she intended to repay this debt, the Court finds that evidence wholly insufficient to overcome the much more substantial evidence in the Bank's favor.

Based upon the totality of the circumstances, the Court finds that Debtor clearly lacked the ability to repay the debts incurred on the Bank's credit card between March 14, 2009 and April 21, 2009 at the time she made those purchases.  In addition, the Court finds that Debtor either knew that she lacked the ability to repay those debts, or was extremely reckless in not knowing that she could not repay the debts.  The only way Debtor was able to continue making the minimum monthly payments on her credit cards was by incurring massive amounts of new debt on those same credit cards each month.  Once she had consumed all of her available credit, which is the place Debtor essentially found herself at the time she filed bankruptcy, she had no realistic hope that she could continue to make even the minimum monthly payments.  In this case, the Bank was the final credit

---

[29]*See* attachment to Bank's Exhibit 3 for a list of charges.

card (other than a few cards that could be used only in specific stores) that had any sizable available credit in the spring of 2009. The Court finds it was no accident that the use of that remaining available credit coincided with her decision to file bankruptcy.

The Bank demonstrated that by the terms of the credit agreement with the Bank, and by her own testimony at trial, each time Debtor made a purchase on her credit card she represented to the Bank that she had not only the intent, but also the ability, to repay the debt. Based upon the evidence received, the Court finds that those representations, as they relate to the charges incurred between March 14, 2009 and April 21, 2009, were false and were either intentionally false, or made with an extremely reckless disregard for the truth. The Court also finds that the Bank reasonably relied upon those representations to its detriment, and was damaged as a result. Therefore, the Bank has met its burden of showing that the debt in question should be excluded from discharge in Debtor's bankruptcy case pursuant to § 523(a)(2)(A).

Because the Court has ruled in favor of the Bank in this proceeding, Debtor's counterclaim for attorney fees under § 523(d) is denied.

## III. CONCLUSION

The Court finds that the $9,855.85 debt that Debtor accumulated between March 14, 2009 and April 21, 2009, was incurred by fraud and should be excepted from her discharge in Case No. 09-41148. That portion of the debt owed to First National Bank of Omaha will survive Debtor's bankruptcy and remain personally collectable against Debtor even if she receives a discharge in her Chapter 13 bankruptcy case.

**IT IS, THEREFORE, BY THE COURT ORDERED** that judgment is entered in favor of First National Bank of Omaha, and against Debbie Kay Myers, in the amount of $9,855.85.

15

**IT IS FURTHER ORDERED** that this judgment is nondischargeable in Case No. 09-41148

pursuant to 11 U.S.C. § 523(a)(2)(A).

# # #